UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:14-cr-00214-9 |
| Plaintiff, | : | OPINION & ORDER |
| | : | [Resolving Doc. 1307] |
| v. | : | |
| DAMMARKO NOLAN, | : | |
| Defendant. | : | |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

Nine years ago, Dammarko Nolan received a 168-month prison sentence. Since then, Nolan's health has deteriorated. He now seeks relief under the compassionate-release statute.

Because Nolan's declining health decline presents extraordinary and compelling circumstances and the sentencing factors warrant reducing his sentence, the Court now reduces Nolan's prison term to 156 months.

I.  Background

In 2014, a grand jury indicted Nolan and 30 others for their involvement in a multi-state drug-trafficking conspiracy.[1] Nolan had already been indicted in another drug-trafficking case under Judge Boyko.[2]

On November 21, 2014, Nolan pleaded guilty to conspiracy to possessing heroin with intent to distribute it.

---

[1] Doc. 553 at 6 (PageID 3374).
[2] No. 1:13-cr-345-48, Doc. 35.

Case No. 1:14-cr-214-9
GWIN, J.

In early June 2015, Nolan testified in the case before Judge Boyko against co-defendant Keith Ricks, the "leader of a notoriously violent criminal group."[3] A jury convicted Ricks.

On June 16, 2015, Judge Boyko sentenced Nolan to 132 months' incarceration and three years' supervised release.[4] On June 23, 2015, this Court sentenced Nolan to 168 months' incarceration followed by ten years' supervised release.[5] Those sentences run concurrently.

On June 29, 2020, Nolan moved Judge Boyko for compassionate release.[6] Judge Boyko denied that motion on October 15, 2020.[7]

On August 27, 2020, Nolan moved this Court for compassionate release.[8] The Court denied his motion without prejudice because Nolan had not yet completed his Judge Boyko sentence.[9]

Nolan now qualifies for release to a halfway house in Judge Boyko's sentence.[10] So, on February 4, 2022, he filed a renewed compassionate-release motion,[11] which the Federal Public Defender supplemented.[12] He asks the Court to reduce his sentence to time served.

The Government opposes.[13]

---

[3] Doc. 1329-2 at 1 (PageID 8364).
[4] No. 1:13-cr-345-48, Doc. 1428.
[5] Doc. 798.
[6] No. 1:13-cr-345-48, Doc. 2066.
[7] No. 1:13-cr-345-48, Doc. 2101.
[8] Doc. 1158.
[9] Doc. 1193.
[10] Doc. 1329 at 3 (PageID 8284).
[11] Doc. 1307.
[12] Doc. 1329.
[13] Doc. 1333.

Case No. 1:14-cr-214-9
GWIN, J.

## II. Discussion

Nolan seeks relief under 18 U.S.C. § 3582(c)(1)(A). Since his claim is properly exhausted,[14] the Court first determines whether "extraordinary and compelling reasons" justify reducing Nolan's sentence.[15] After that, the Court considers the § 3553 sentencing factors "to the extent that they are applicable."[16]

### A. Extraordinary and Compelling Reasons

The Sixth Circuit has said that "district courts have discretion to define 'extraordinary and compelling' on their own initiative."[17] But that discretion is not limitless. The Sixth Circuit has established that "facts that existed when the defendant was sentenced cannot later be construed as 'extraordinary and compelling' justifications for a sentence reduction."[18] Additionally, "the combination of grounds for release, none of which independently supports a sentence reduction, does not collectively 'entitle a defendant to a sentence reduction.'"[19]

Exercising its discretion, the Court finds that Nolan's health's deterioration over his nine-year incarceration is an extraordinary and compelling reason for a sentence reduction.

### Peripheral Artery Disease

In 1997, a gunshot wound severed one of Nolan's femoral arteries. As a result, Nolan suffers from peripheral artery disease.

---

[14] *See* Doc. 1160-1 at 2 (PageID 7093) (warden's denial marked received on April 27, 2020). An inmate may move for compassionate release 30 days after receiving notice from his facility's warden that the Bureau of Prisons will not file a compassionate-release motion on his behalf. 18 U.S.C. § 3582(c)(1)(A).

[15] *United States v. Bass*, 17 F.4th 629, 635–36 (6th Cir. Nov. 3, 2021) (quoting 18 U.S.C. § 3582(c)(1)(A).

[16] *Id.*; *see also id.* n.2 (18 U.S.C. § 3582(c)(1)(A)(ii) policy statement requirement "does not apply" to inmate-filed motions).

[17] *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021); *see also United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.").

[18] *United States v. Lemons*, 15 F.4th 747, 750 (6th Cir. 2021) (quoting *United States v. Hunter*, 12 F.4th 555, 562 (6th Cir. 2021)).

[19] *Lemons*, 15 F.4th at 749 (quoting *United States v. Jarvis*, 999 F.3d 442, 444 (6th Cir. 2021)).

Case No. 1:14-cr-214-9
GWIN, J.

Over the last five years, Nolan's vascular health has deteriorated. In December 2018, Nolan underwent vascular surgery, requiring two weeks in the hospital for wound drainage.[20] And in November 2019, Nolan underwent a four-hour embolectomy–thrombectomy, requiring five days in the hospital.[21] Doctors contemplated a third surgery, but ultimately decided that "the safest long term limb salvage strategy was to pursue a conservative approach."[22]

Throughout 2021, Nolan reported significant circulatory problems. His left foot's toes darkened, and his left leg swelled. His surgeries caused an infection that eventually required months of oral and intravenous antibiotics.[23]

In April 2022, Nolan underwent another vascular surgery to address the infection.[24] His recovery took more than a month—first in the hospital, and then in a skilled-nursing facility.[25] Because the April 2022 removed an infected arterial graft, Nolan will eventually require another surgery to replace that graft. That surgery would ensure proper circulation and avoid amputation.[26]

The Government characterizes Nolan's condition as "self-created."[27] Specifically, it points to Nolan's decisions to end a medical exam prematurely in January 2021 and refuse a bandage after his April 2022 surgery. But it does not explain how these decisions caused Nolan's deterioration. On the contrary, Nolan's medical history shows that he first

---

[20] Doc. 1329 at 5 (PageID 8286).
[21] *Id.*
[22] *Id.* at 6–7 (PageID 8287–88).
[23] *Id.*
[24] Doc. 1329-1 at 19–20 (PageID 8316–17).
[25] Doc. 1329
[26] Doc. 1329 at 8 (PageID 8289).
[27] Doc. 1333 at 12 (PageID 8383).

Case No. 1:14-cr-214-9
GWIN, J.

underwent vascular surgery in 2018—well before the incidents the Government points to. So, the Court will not attribute Nolan's deterioration to his own conduct.

In his *pro se* motion, Nolan says of his medical condition, "it doesn't look good for [him]."[28] Nolan's ailing health presents an extraordinary and compelling circumstance supporting a sentence modification.

### COVID-19 Pandemic

The Court agrees with Nolan that—even setting his incarceration during the COVID-19 pandemic aside—his ailing vascular health alone presents an extraordinary and compelling reason to modify his sentence. But the Court will also address the unique challenges the pandemic presents for Nolan.

While the Sixth Circuit has said that, in most circumstances, vaccinated inmates cannot cite COVID-19 as an extraordinary and compelling reason to modify a sentence,[29] the pandemic has made Nolan's "incarceration harsher and more punitive than would otherwise be the case" and "exceeds what the Court anticipated at the time of sentencing."[30]

A physician who reviewed Nolan's file says that his peripheral artery disease placed him "at high risk of needing a high level of care, getting serious and debilitating complications, including limb damage and loss, and dying, should he contract COVID-19."[31]

---

[28] Doc. 1307.
[29] *See Lemons*, 15 F.4th at 751.
[30] *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) (Rakoff, J.) (citations omitted); *see also United States v. Coops*, 2021 WL 5177870, at *3 (N.D. Ohio Nov. 8, 2021).
[31] Doc. 1329 at 5–6 (PageID 8287–88).

Case No. 1:14-cr-214-9
GWIN, J.

In December 2020, Nolan contracted COVID-19.[32] He recovered, but experienced shortness of breath even weeks after his other symptoms resolved.[33]

Studies demonstrate that, although fully vaccinated people like Nolan are generally less likely to experience severe COVID-19 complications,[34] his peripheral artery disease makes him 40% more likely to suffer death or other major adverse cardiovascular events from COVID-19.[35]

Further, although most people reinfected with COVID-19 experience similar or milder symptoms when compared to their first infection, about one in eight reinfected patients experience worse symptoms the second time around.[36]

Nolan will also require another surgery to replace an arterial graft in his leg to ensure proper circulation and avoid amputation.[37] A potential COVID-19 reinfection during his recovery creates a threat. Patients who contract COVID-19 while recovering from surgery face "8.4 times the rate of pulmonary complications, 3 times the rate of major complication, and 2.6 times the rate of any complication."[38]

Finally, as Nolan points out, while getting vaccinated provides substantial protection from reinfection, his age and health make the vaccine less effective.[39]

---

[32] *Id.* at 6 (PageID 8287).
[33] Doc. 1329-1 at 9 (PageID 8306).
[34] *COVID-19 after Vaccination: Possible Breakthrough Infection*, CDC (June 23, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html.
[35] Kim G. Smolderen et al., *Peripheral Artery Disease and COVID-19 Outcomes: Insights from the Yale DOM-CovX Registry*, 2021 CURRENT PROBLEMS IN CARDIOLOGY.
[36] *See* Jingzhou Wang, et al., *COVID-19 reinfection: a rapid systematic review of case reports and case series*, 69 J. INVESTIGATIVE MED. 1253 (2021).
[37] Doc. 1329 at 8 (PageID 8289).
[38] Nikhil K. Prasad et al., *Increased complications in patients who test COVID-19 positive after elective surgery and implications for pre and postoperative screening*, 223 AM. J. SURGERY 380, 383 (2021).
[39] Doc. 1329 at 11 (PageID 8289) (citing *United States v. Sawyer*, No. 5:15-cr-160, 2021 WL 3051985, at *2 (E.D.N.C. June 15, 2021)).

- 6 -

Case No. 1:14-cr-214-9
GWIN, J.

All told, Nolan's incarceration entails harsher and more punitive conditions than the Court contemplated at sentencing. His incarceration during the pandemic therefore presents a second, independent extraordinary and compelling reason to modify his sentence.

### B. Section 3553 Factors

The Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant," the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" the need for the sentence "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant," and the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[40]

The Court finds that Nolan's danger to the public and danger of recidivism diminishes as he ages and his health deteriorates. The Court also concludes that 168 months' incarceration provides little more deterrence than 156 months' incarceration.[41] When Nolan is released from prison, he will be in his 50s. At that age and with his health conditions—which threaten to deprive him of one of his legs—the Court finds that he presents reduced risk to the public.

The Court also observes that Nolan has completed prison rehabilitative opportunities. Prior to the pandemic, Nolan had completed 13 vocational and educational

---

[40] 18 U.S.C. § 3553(a).
[41] *See* U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 3 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf ("Older offenders were substantially less likely than younger offenders to recidivate following release.").

Case No. 1:14-cr-214-9
GWIN, J.

classes in four years.[42] He also successfully completed a nonresidential drug-treatment program.[43]

The Court further notes that the case agent who investigated Nolan's drug-trafficking involvement wrote a letter supporting Nolan's motion.[44]

Although the Court will reduce Nolan's sentence by 12 months, the Court rejects Nolan's request to reduce his sentence to time served. Nolan's criminal history and involvement in two simultaneous drug-trafficking conspiracy cases both counsel against immediate release.

Finally, the Court notes that it departed significantly from the recommend guidelines range when it first sentenced Nolan. The sentencing guidelines recommended 262–327 months' incarceration.[45]

### III. Conclusion

Accordingly, the Court **GRANTS** in part and **DENIES** in part Nolan's motion for compassionate release. His incarceration sentence is reduced to 156 months. All other conditions remain the same.

IT IS SO ORDERED.

Dated: November 9, 2022                             *s/     James S. Gwin*
                                                    JAMES S. GWIN
                                                    UNITED STATES DISTRICT JUDGE

---

[42] *See* Doc. 1123-2 at 1 (PageID 6744).
[43] Doc. 1123-3.
[44] Doc. 1329-2.
[45] Doc. 553 at 25 (PageID 3393).

- 8 -